UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SEIU HEALTHCARE 1199NW, a labor organization,<br><br>    Plaintiff,<br><br> v.<br><br>COMMUNITY PSYCHIATRIC CLINIC,<br><br>    Defendant. | CASE NO. C19-1210 MJP<br><br>ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER |

THIS MATTER comes before the Court on Plaintiff's Motion for a Temporary Restraining Order and Order to Show Cause why a Preliminary Injunction Should Not Issue. (Dkt. No. 2.) Having reviewed Plaintiff's Motion, the Response (Dkt. No. 8), and all related papers, the Court DENIES the Motion.

**Background**

Plaintiff, SEIU Healthcare 1199NW (the "Union"), which represents over 200 current employees of Defendant, Community Psychiatric Clinic ("CPC"), seeks to enjoin Defendant

from merging with Sound, another mental healthcare provider. (Dkt. No. 3, Declaration of Jason Beauchene ("Beauchene Decl."), ¶¶ 4, 6.) Plaintiff contends the sale to Sound violates the Parties' collective bargaining agreement ("CBA"), which controls the wages, hours, and other terms and conditions of employment at CPC. (Id. ¶ 5, Ex. A.) Without an injunction, Sound will assume Defendant's assets and liabilities at the end of this month. (Id. ¶ 6; Dkt. No. 10, Declaration of Bruce Smith ("Smith Decl."), ¶ 5, Ex. 1.)

From January 2018 through March 11, 2019 the Parties were in negotiations regarding the current iteration of their CBA. (Id. ¶ 13.) On March 11, the Parties achieved a recommended settlement agreement, with the new contract including a provision for addressing employee issues in the event of a merger or sale of CPC. (Id. ¶ 14.) The Union signed the CBA on April 25, 2019, but Defendant contends the Union did not deliver a copy of the agreement that was signed by the Union until July 10, 2019. (Beauchene Decl., Ex. A at 27; Smith Decl. ¶ 15.) The CBA was "effective [on the] date of signing." (Beauchene Decl., Ex. A at 26.)

On March 20, 2019, Defendant entered into a letter of intent with Sound, beginning the process of negotiating a potential sale. (Beauchene Decl. ¶ 6; Smith Decl. ¶ 5, Ex. 1.) During the negotiations that followed, Defendant claims that it described the CBA to Sound and requested that Sound continue employment for former CPC employees on the same or similar terms as those employees had with CPC. (Smith Decl. ¶¶ 6-7.) On April 15, 2019, CPC and Sound signed an Asset Transfer Agreement. (Id. ¶ 8.) According to Defendant, due to regulatory, funding, and staffing challenges, without the sale to Sound, it will be "almost impossible" for CPC to remain open after August 31. (Smith Decl. ¶¶ 31-35.)

Two days after signing the agreement with Sound, Defendant's Chief Executive Officer, Douglas Crandall, emailed all CPC employees and texted a Union representative to announce

that CPC and Sound would merge.  (Beauchene Decl. ¶ 7; Dkt. No. 9, Declaration of Matthew W. Lynch ("Lynch Decl."), ¶ 3, Ex. 1.)  CPC employees began receiving letters in mid-June that their employment with CPC would end on August 31, 2019.  (Beauchene Decl. ¶ 15.)  Approximately 15 current CPC employees were not offered employment with Sound; these employees are not the least senior in their program, pay grade, or specialty.  (Beauchene Decl. at ¶ 16; see Dkt. No. 14.)  Several of these employees have submitted declarations describing their concerns about finding future employment and their ability to obtain medical care when their employment ends.  (See Dkt. No. 3, Ex. K, Declaration of Belinda Allender ("Allender Decl."), ¶¶ 4-7; Ex. L, Declaration of Chris Dyson ("Dyson Decl."), ¶¶ 2, 4; Ex. M, Declaration of Kirsten Staszak ("Staszak Decl."), ¶¶ 2-5; Ex. O, Declaration of Dendrie Lynn Plodzrein ("Plodzrein Decl."), ¶¶ 2-4, 6.)

For those CPC employees who have received offers from Sound, the terms and conditions of their employment will change.  (Beauchene Decl. ¶ 17.)  For example, they will no longer have a clause that permits Sound to terminate them only for "just cause," and will have a new high-deductible health insurance plan where the current CPC plan is low-deductible.  (Id.)  For at least one employee, the new health insurance plan means she will be unable to afford her current medications.  (Id., Ex. N, Declaration of Abigail Minor ("Minor Decl."), ¶¶ 3-6.)  These employees will also forfeit any accrued sick leave over 120 hours, may lose accrued vacation hours, and will be required to undergo background checks.  (Beauchene Decl. ¶¶ 18-20.)

On April 30, 2019, the Union requested information about the partnership between CPC and Sound.  (Beauchene Decl. at ¶ 9, Ex. C.)  In response, Defendant provided the Letter of Intent, the Asset Transfer Agreement, and a flash drive with copies of service delivery contracts and other documents but did not provide information regarding the terms and conditions of

employment for those CPC employees who received offers with Sound. (Id.; Smith Decl. ¶¶ 18-19, Ex. 7.) In accordance with the CBA's four-step grievance procedure, Plaintiff filed a grievance on June 5, 2019, complaining that the successorship provision of the CBA had been violated and the notice period was insufficient; the parties held a grievance meeting on June 20, 2019. (Beauchene Decl. ¶ 12, Ex. D; Smith Decl. ¶ 19.) Although not provided for in the CBA, Plaintiff requested that the Parties enter expedited arbitration. (Id.; Ex. A.) On August 1, having received no response, Plaintiff again requested expedited arbitration and an agreement that Defendant delay the asset transfer until completion of arbitration. (Id.) The Parties have now reached Step Three of the grievance process, the final step before arbitration. (Id. at ¶ 29; see Dkt. No. 14.)

## Discussion

### I. Legal Standard

The Norris–LaGuardia Act, 29 U.S.C. §§ 101, et seq., generally limits a district court's power to issue injunctions in disputes between a union and an employer. In Boys Markets, Inc. v. Retail Clerks Union, Local 770, the Supreme Court recognized an exception to the Act's anti-injunction provisions and allowed equitable relief to prevent a union from going on strike over a dispute that was subject to a binding arbitration process. 398 U.S. 235, 253 (1970) (injunctive relief can support the central purpose of the Norris–LaGuardia Act when it "merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration"); see also Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 407, (1976) ("The driving force behind Boys Markets was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties.").

Courts have also found injunctive relief to be appropriate in so-called "reverse <u>Boys Markets</u>" instances where "an employer makes changes in areas which are subject to the grievance-arbitration procedure, and the union seeks to enjoin the employer from making the changes until the grievance is resolved through arbitration." <u>Newspaper & Periodical Drivers' & Helpers' Union, Local 921 v. San Francisco Newspaper Agency</u>, 89 F.3d 629, 632 (9th Cir. 1996).

Under the reverse <u>Boys Markets</u> exception, courts have found injunctive relief available where:

> (1) the collective bargaining agreement contains a mandatory arbitration provision; (2) the underlying dispute is arbitrable; (3) the party seeking arbitration is prepared to arbitrate; and (4) issuance of an injunction would be warranted under ordinary principles of equity-whether breaches are occurring and will continue, or have been threatened and will be committed; whether the breaches have caused or will cause irreparable injury to the Union; and whether the Union will suffer more from the denial of an injunction than will the Employer from its issuance.

<u>Id.</u> at 632.

Because the Parties here do not contest that the first three factors are met (Dkt. No. 2 at 14; <u>see generally</u> Dkt. No. 8), the only issue before the Court is whether an injunction would be warranted under the ordinary principles of equity outlined above.

**A. Breach of Contract**

Plaintiff contends it is entitled to injunctive relief to preserve the status quo pending arbitration because Defendant has violated the transparency and seniority provisions of the CBA. A plaintiff "'seeking to maintain the status quo pending arbitration pursuant to the principles of <u>Boys Markets</u> need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor.'" <u>San Francisco Newspaper Agency</u>, 89 F.3d at 632 (quoting <u>Amalgamated Transit Union v. Greyhound Lines, Inc.</u>, 529

F.2d 1073 (9th Cir. 1976) ("Greyhound I"), vacated and remanded, 429 U.S. 807, 97 (1976), reversed on remand, 550 F.2d 1237 (9th Cir.) ("Greyhound II"), cert. denied, 434 U.S. 837 (1977). For the reasons discussed below, Plaintiff has not met this burden.

Plaintiff first alleges that Defendant violated the good faith and transparency requirements enumerated under Section 24.3 of the CBA. Under that provision, the Parties are required to use good faith efforts to "maintain transparency and timely communication throughout the process to minimize the potential adverse impacts." (Beauchene Decl., Ex. A at 26.) "In particular, the parties will use good faith efforts to adhere to the following guidelines":

(1) Inform represented employees of any potential sale or transfer at least 120 days in advance;

(2) Meet with the Union to discuss any potential sale or transfer that will impact employees;

(3) Inform the potential buyer of the existence of this agreement and encourage the buyer to adopt similar conditions in the interest of preserving a high quality workforce; and

(4) Make every effort to sell to an entity "that will preserve the organizational mission and values of the Employer";

(5) "None of the above shall constitute encumbrances or restrictions on negotiations with a potential buyer, or any final sale or transfer."

(Id.)

Plaintiff has failed to demonstrate that Defendant violated either the specific provisions of Section 24.3 or what Plaintiff describes as a separate requirement that the Parties act with transparency and good faith. (Dkt. No. 2 at 22.) First, contrary to Plaintiff's allegations (Dkt. No. 2 at 11), the only evidence in the record shows that Defendant informed employees and a Union representative of the impending asset sale on April 17, 2019, 136 days in advance of the closing date. (Dkt. No. 8 at 12; Smith Decl. ¶ 16, Ex. 3; Dkt. No. 9, Declaration of Matthew W. Lynch ("Lynch Decl."), ¶ 3, Ex. 1.) Plaintiff also alleges that Defendant violated subsection

three by failing to inform Sound of the existence of the CBA and failing to encourage Sound to adopt similar conditions in the interest of preserving a high-quality workforce. (Dkt. No. 2 at 11-12.) But Defendant has submitted evidence that it discussed the CBA in several meetings with Sound and requested Sound continue employment for former CPC employees on the same or similar terms. (Smith Decl. ¶¶ 5-7, Ex. 1.)

While Defendant complied with the explicit terms of Section 24.3, Plaintiff also claims Defendant violated additional unenumerated requirements when it waited to provide the Letter of Intent and Asset Transfer Agreement until May 24, 2019 and did not provide the Union with requested information regarding the impact of the sale on Union-represented employees. (Dkt. No. 2 at 11.) But Defendant met with the Union on five occasions to discuss the sale and initiated these discussions itself when the Union failed to do so. (Dkt. No. 8 at 12-13; Smith Decl. ¶¶ 20, 23-25, 28.) Where Defendant met its enumerated obligations under Section 24.3, and demonstrated significant efforts to communicate with the Union, the Court declines to find that Defendant had additional, unspecified obligations to be more transparent, especially in light of the clear edict that none of the provisions of Section 24.3 "shall constitute encumbrances or restrictions on negotiations with a potential buyer, or any final sale or transfer." (Beauchene Decl., Ex. A at 26.) The Court cannot ignore the terms the Parties have explicitly negotiated, especially when Plaintiff agreed to those terms <u>after</u> learning about the sale to Sound. (Beauchene Decl. ¶ 7, Ex. A at 26-27; Lynch Decl., ¶ 3, Ex. 1.) Based on the briefing and the evidence in the record, the Court finds that Plaintiff's Section 24.3 arguments are insufficiently sound to render arbitration on these points more than a futile endeavor.

Plaintiff also fails to demonstrate its arguments regarding the seniority provision of the CBA are sufficiently sound. The seniority provision mandates that in the event of layoff, partial

layoff, or hours reduction, "seniority shall prevail amongst regular employees except where there are substantial considerations as to qualifications of the employees for the available work." (Dkt. No. 2 at 12; Beauchene Decl., Ex. A at 15.) But, as Defendant argues, the seniority provision does not apply here because all CPC employees will be dismissed on August 31, 2019, when Sound absorbs CPC; the seniority provision—which allows those with seniority to remain employed—cannot apply to an organization that will no longer exist. (Dkt. No. 8 at 14; Dkt. No. 1, ¶ 41.)

### B. Irreparable Injury

Plaintiff contends the employees here face irreparable harm that could not be remedied in arbitration if the August 31, 2019 sale occurs. (Dkt. No. 2 at 15.) A union is entitled to a status quo injunction pending arbitration "only if any arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction. . . ." San Francisco Newspaper Agency, 89 F.3d at 634. This standard is akin to the usual requirement that the movant must establish irreparable harm. Id.

The potential harms in this case include the loss of employment without possibility of reinstatement, loss of medical benefits resulting in foregone care, and other harms including potential homelessness. (Dkt. No. 2 at 15.) Defendant contends that any injury to employees at this point is merely speculative, or constitutes common harms experienced by most discharged employees, which do not support a finding of irreparable injury. (Dkt. No. 8 at 16-17.) But "[p]ermanent loss of employment which an arbitrator cannot reverse clearly constitutes irreparable injury and a frustration of arbitration." Graphic Commc'ns Conference—Int'l Bhd. of Teamsters Local 404M v. Bakersfield Californian, 541 F. Supp. 2d 1117, 1124 (E.D. Cal. 2008); see also Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-

CIO v. Panoramic Corp., 668 F.2d 276, 286 (7th Cir. 1981). The same is true for losing necessary health care coverage, see United Auto., Aerospace & Agr. Implement Workers of Am., Amalgamated Local 645, AFL-CIO v. Gen. Motors Assembly Div., No. 82-5530, 1982 WL 2028, at *2 (C.D. Cal. Oct. 29, 1982); Risteen v. Youth For Understanding, Inc., 245 F. Supp. 2d 1, 16 (D.D.C. 2002), especially where, as here, Plaintiff presents evidence that several employees will be unable to afford care for their ongoing, serious medical conditions. (See Minor Decl., ¶¶ 3-6; Allender Decl., ¶ 11.)

Defendant also argues that Plaintiff's delay in seeking injunctive relief—Union members knew of the sale in April, yet Plaintiff did not seek an injunction until August—is inconsistent with Plaintiff's insistence that it faces irreparable harm. (Dkt. No. 8 at 13.) This argument is compelling, see Valeo Intellectual Prop., Inc. v. Data Depth Corp., 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (citing Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1377 (9th Cir.1985)), but does not overcome the evidence demonstrating the irreparable injuries that several employees will experience if they lose their employment and healthcare.

The Court finds that Plaintiff has sufficiently established irreparable harm that cannot be undone by an arbitral award.

**C. Balance of the Equities**

Plaintiff argues that the equities tip in the Union's favor because an injunction preventing employees from facing unemployment with no possibility of reinstatement, possible homelessness, and the loss of necessary medical care "must be in the public interest." (Dkt. No. 2 at 23.) Defendant counters that if the Court enjoins the sale, approximately 200 CPC employees risk unemployment, compared to the 15 or so employees who were not offered employment by Sound. (Dkt. No. 8 at 18; see Dkt. No. 14.) Further, enjoining the sale will

affect thousands of clients with behavioral, health, and chemical dependency issues because CPC will be unable to effectively manage and continue operations and services after August 31, 2019. (Dkt. No. 8 at 18; Smith Decl. ¶¶ 31-35.) Given the number of employees who would lose employment if CPC closes and the thousands of patients who would lose care, and without countervailing evidence to suggest the CPC is likely to remain open beyond the August 31, 2019 sale, the Court finds that the balance of the equities tips strongly in Defendant's favor.

**Conclusion**

Because Plaintiff has failed to establish the position it would take in arbitration is sufficiently sound as there is no indication that Defendant violated the CBA and because the balance of the equities favors Defendant, Plaintiff's Motion is DENIED.

The clerk is ordered to provide copies of this order to all counsel.

Dated August 12, 2019.

Marsha J. Pechman
United States District Judge